UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CONTRACTOR'S SOURCE INC., | § § | |
| Plaintiff, | § § | |
| v. | § | CIVIL ACTION NO. 09-cv-0069 |
| | § | |
| HANES COMPANIES, INC., | § § | |
| Defendant. | § § | |

## MEMORANDUM AND ORDER

Pending before the Court is the Motion for Partial Summary Judgment of Defendant Hanes Companies, Inc. ("Defendant") (Doc. No. 17), and the Cross-Motion for Partial Summary Judgment of Plaintiff Contractor's Source Inc. ("Plaintiff") (Doc. No. 26). For the following reasons, Defendant's Motion is denied and Plaintiff's Motion is granted.

I.  BACKGROUND[1]

Defendant is the seller of non-woven materials and woven fabrics and knits, including silt fencing used to minimize sediment runoff. (Def. Mot. at 3.) In October of 2005, Defendant purchased IKEX, LLC ("IKEX"), a North Carolina-based distributor of geosynthetic products, including ground synthetics, erosion products, drainage products, geogrids, and ground fabrics. (Zachary C. Cox Aff., Def. Ex. 1, ¶ 4.) Following this integration, IKEX maintained its practice of mailing an invoice to customers one day after the shipment of ordered goods. (*Id.*) Near the end of January of 2007, IKEX began to include on its invoices the preprinted terms that had been included in invoices sent by Defendant prior to the merger. (*Id.* at ¶ 5.) In relevant part, these preprinted terms stated:

---

[1] The parties are agreed as to the facts set forth in this section except as otherwise noted.

1

> [I]n no event . . . shall seller be liable for indirect, special, or consequential damages, nor shall seller, in any event, be liable for damages in excess of the purchase price, and shipping costs, of the product claimed to be defective.

(Def. Mot. at 4.)

Plaintiff is also a distributor of geosynthetic products. (Phillip Gary Brecher Dep., Def. Ex. 2, 9:14-21, July 8, 2009.) Plaintiff first submitted a purchase order for silt fence fabric ("Material") from IKEX, then wholly owned by Defendant, in December of 2006 (Phillip Gary Brecher Am. Decl., Pl. Br. Ex. A, Doc. No. 43, ¶ 4.)[2] The corresponding invoice generated from this order did not contain the preprinted terms included above. (*Id.*) In early 2007, Defendant directed Plaintiff to place all orders for Defendant's products through Lone Star Geo Products, L.L.C. ("Lone Star"), a wholly owned subsidiary of Defendant with offices in Dallas, Austin, and Houston, Texas. (*Id.*) Following this directive, Plaintiff avers that it generally dealt with two Lone Star representatives based in Texas in connection with the purchase or performance of any of Defendant's geosynthetic products. (*Id.*)

---

[2] Defendant moves to strike the amended declaration of Phillip Gary Brecher, filed by Plaintiff in response to Defendant's objections to his original declaration (Doc. No. 47). To the extent that this amended declaration cures deficiencies raised in Defendant's objections to the original regarding the declarant's competency and personal knowledge, the Motion is denied. *See, e.g., Chapman v. Merrill Lynch*, 597 F. Supp. 623, 624-25 (D. Md. 1984). However, the Court acknowledges that the amended declaration also includes additional factual information not included in the original. Many of these additional facts had no bearing on the Court's decision in resolving the summary judgment Motions, and therefore need not be addressed. Some of these additional facts were simply reiterations of facts or allegations presented elsewhere in the record, and thus the Court found no impropriety in considering them. The only fact presented in the amended declaration that the Court found to be entirely new is the declarant's allegations that Defendant admitted that the Material delivered to Plaintiff in April of 2007 was different from that delivered in December of 2006. (Brecher Am. Decl. ¶ 7.) These allegations, as they pertain to what Defendant allegedly said, are entirely unsubstantiated, and the Court weighs them accordingly. However, the underlying truth of these statements is circumstantially supported by the fact that Plaintiff's claims concern only the April 2007 Material, and not the December 2006 Material. Furthermore, considering the limited role these facts played in the Court's determination (see section V.B. of this Memorandum, below), the Court concludes that, in the interest of justice, these additional statements need not be struck. Defendant's Motion is therefore DENIED.

On April 10 or 11, 2007, Plaintiff placed another order for Material with Lone Star (the "April 2007 Order"). (*Id.*; Def. Mot. Ex. 1.) Lone Star informed Plaintiff that it no longer had the Material in its warehouse and directed Plaintiff to place the order with IKEX in North Carolina. (Brecher Am. Decl. ¶ 7.) Plaintiff did so, and Material was delivered on April 11, 2007.[3] (*Id.*) The day after the Material was delivered, on April 12, IKEX sent Plaintiff an invoice for the April 2007 Order containing the additional invoice terms reproduced above. (Def. Mot. Ex. 1.) This invoice was dated "4/12/2007." (Def. Mot. Ex. 1.) However, Plaintiff avers that it did not become aware of the additional invoice terms until after this litigation began. (Brecher Am. Decl. ¶ 6; Brecher Dep. 184:6-10.) Plaintiff then sold the Material to its end user customers, who installed the Material as silt fencing throughout the Houston area. (Pl. Compl., Doc. No. 28, ¶ 7.) Prior to this, in February of 2007, Plaintiff ordered another geosynthetic product for which IKEX sent an invoice containing the additional terms reproduced above. Plaintiff paid the amount specified in this invoice by check sent to IKEX in North Carolina. (Def. Mot. Ex. 1.)

Plaintiff then filed this suit, alleging that the Material sent on April 11 failed within months of installation and that Plaintiff's customers have demanded that Plaintiff cover their resulting expenses. (Pl. Compl. ¶ 7.) Plaintiff asserts claims against Defendant for breach of contract, breach of express and implied warranties, fraud, and deceptive trade practices. Defendant now moves for summary judgment as to particular elements of the case, and Plaintiff cross-moves for the same.

## II.  LEGAL STANDARD

---

[3] Although the parties proffer different dates as to when the April 2007 Order was placed, they agree that the Material was delivered on April 11.

3

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.* Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. F.R.C.P. 56(e)(1); *See, e.g., Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996), *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts.'" (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## III.  CHOICE OF LAW

The first issue as to which both Defendant and Plaintiff move for judgment is the state law to be applied to this dispute. Defendant argues that North Carolina law should apply, while Plaintiff maintains that Texas law should apply.[4]

---

[4] Defendant is correct that, absent a true conflict between two bodies of law, the Court need not undertake a choice of law analysis. *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 419 (Tex. 1984). In its Motion,

District courts sitting in diversity apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941); *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 403 (5th Cir. 2004); *Smith v. EMC Corp.*, 393 F.3d 590, 597 (5th Cir. 2004). For choice of law determinations, Texas applies the "most significant relationship" test, provided by the Restatement (Second) Conflict of Laws. *Mitchell v. Lone Star Ammunition, Inc.*, 913 F.2d 242, 249 (5th Cir. 1990); *Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex. 1979). In applying this test to contractual disputes, courts should consider the following factors:

> (a) the place of the contracting;
> (b) the place of negotiation;
> (c) the place of performance;
> (d) the location of the contract's subject matter; and
> (e) the parties' domicile, residence, nationality, place of incorporation, and place of business.

RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 188 (1971); *Minn. Mining and Mfg. Co. v. Nishika*, 953 S.W.2d 733, 735 (Tex. 1997).[5] The most significant relationship approach turns not on the number of contacts that a party has with a particular state, but on "the qualitative nature of those contacts," as informed by the policy factors

---

Defendant identifies a potential conflict in the application of the Uniform Commercial Code ("UCC") in Texas and North Carolina. Because both states have in fact adopted the UCC into their codes, a determination of whether North Carolina and Texas case law conflict as to the *application* of the UCC would in essence require an analysis of the facts of this case under the case law of both jurisdictions. Realizing that this may be a futile exercise because, if the case law does not conflict, then analysis under both is superfluous, and if they do conflict then a choice of law analysis is required anyway, this Court chooses to move directly to the choice of law analysis for the sake of efficiency.

[5] In addition to the contacts analysis, the Restatement test includes consideration of several policy factors. These policy factors include: (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied. RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 6 (1971).

enumerated in the Restatement. *Mitchell*, 913 F.2d at 249 (citing *Gutierrez*, 583 S.W.2d at 319). The Court now applies those factors to this case.

Plaintiff maintains its principal place of business in Houston, Texas (Pl. Compl. ¶ 1.) Thus, it places its orders, including the April 2007 Order, from this location. Plaintiff also distributes geosynthetic products to customers who use them primarily in Harris County. (Pl. Compl. ¶ 7; Brecher Am. Decl. ¶ 4.) IKEX has its principal place of business in North Carolina. (Zachary Cox. Aff., Def. Mot. Ex. 1, ¶ 8.)[6] The April 2007 Order of Material at issue here was eventually directed to IKEX in North Carolina, and the goods were sent from there as well. (*Id.*) Payment for the April 2007 Order was remitted by check to IKEX in North Carolina. (Brecher Dep. 181:12-19.) Thus, the contract in this case was formed through placement of a purchase order and then delivery of goods, rather than ongoing negotiations between Plaintiff and IKEX. The Court is given no information as to how the purchase order was generated, what terms were listed on the purchase order, or how it was processed upon receipt by IKEX. Thus, it is not immediately clear whether Texas or North Carolina is the place of contracting in this case. The straightforward Restatement factors do not, therefore, make the applicable law

---

[6] Defendant's principal place of business is in dispute between the parties. Plaintiff argues that Defendant's principal place of business in 2007 was Dallas, Texas. In support of this, they attach the Texas Franchise Tax Public Information Report for 2007 in which Defendant reported their principal place of business as Dallas, Texas. (Pl. Mot. Ex. D.) Defendant maintains that its principal place of business is North Carolina, and that the Texas Franchise Tax Public Information Report merely reflects Defendant's only Texas location in 2007. Defendant also avers that the relevant party in this case is IKEX, as a wholly owned subsidiary of Defendant, and that IKEX's principal place of business is North Carolina. Plaintiff challenges IKEX's principal place of business by pointing out that in its 2007 Annual Report, IKEX listed as its principal office mailing address and the addresses of its officers a location in Carthage, MO. (Pl. Mot. Ex. E.) Weighing all the evidence, and despite Plaintiff's objections to the evidence presented by Defendant on this point, this Court chooses to adopt Defendant's representations as to where it was principally located for purposes of this dispute. Particularly since evidence shows that payment for IKEX products was remitted to North Carolina, the address listed on IKEX invoices is in North Carolina, and the registered office mailing address listed in the IKEX 2007 Annual Report is in North Carolina, the Court finds Defendant's assertions persuasive and factually sound. (Def. Mot. Ex. 1; Pl. Mot. Ex. E.)

readily apparent. Accordingly, the Court turns to the quality of the contacts involved and the policy considerations listed in the Restatement and adopted by this state.

Plaintiff maintains that, starting in early 2007 and at Defendant's instruction, it began communicating exclusively with Lone Star representatives in Texas regarding its transactions with Defendant. (Brecher Am. Decl. ¶ 4.) Plaintiff also avers that it placed the April 2007 Order with IKEX in North Carolina only after it was told by Lone Star that it had a shortage of the Material in its Texas warehouse and the order should be so directed. (*Id.*) Other than this, the record shows that Plaintiff's only other contact with North Carolina in 2007 was a check sent to IKEX upon delivery of the February order for a product other than Material. (Def. Mot. Ex. 1). It is not entirely clear from the record how the February order was placed and to whom it was initially directed, although according to Defendant the goods were shipped from North Carolina, and payment was sent to IKEX in North Carolina. (*Id.*; Darren Jones Aff., Def. Br. Ex. 1, Doc. No. 36, ¶ 10.) Defendant also points out that in 2006, when Plaintiff began purchasing goods from IKEX, all goods were shipped from North Carolina and payment was remitted to North Carolina. (Jones Aff. ¶¶ 4-6.)

In evaluating the quality of these contacts as they relate to *this particular contract*, namely the April 2007 Order for Material, this Court finds that Texas has the most significant relationship to this case. Not only was the purchase order generated in Texas and initially directed to a Texas-based company with the understanding that it would be shipped from a Texas warehouse, but the product was then distributed to customers who primarily used it in Texas. Thus, the failure of the product that led to this lawsuit occurred largely in Texas. That this order was eventually directed to North

Carolina in this instance is pure happenstance—had Lone Star stocked the Material in its warehouse, the contract would have taken place entirely in Texas according to the parties' expectations. While the court recognizes that payment for the Material was remitted to North Carolina, this goes to only one factor in the choice of law analysis: the performance of the contract. All other facts seem to suggest that Texas has stronger ties to this dispute. In addition, Defendant's averment that the parties' 2006 transactions all occurred directly through IKEX in North Carolina is unpersuasive. This argument is also countered by Plaintiff's representation that, of the five separate geosynthetic product purchase transactions that form the entirety of all ongoing disputes between these parties, four were initiated by orders placed with Lone Star, three were shipped from Lone Star's warehouse in Texas, and one was shipped from a manufacturer in South Carolina. (Pl. Mot. at 2; Pl. Br., Doc. No. 43, at 1.)[7] Thus, whatever the relationship of the parties in 2006, by the time of the April 2007 Order from which this particular case arises, the parties expected and intended that most, if not all, of the contracting was to take place in Texas.

Furthermore, while not dispositive in this case, the Court does take note of the findings of the magistrate judge in North Carolina in a case related to this one. (Pl. Mot. Ex. A.) That case was brought by Defendant to collect monies allegedly owed by Plaintiff for goods sold by IKEX and Lone Star. (*Id.* at 2.) There, the magistrate court found that it could not exercise personal jurisdiction over Plaintiff. The court noted that, in its

---

[7] Plaintiff provides no other information as to the other four transactions around which it claims the parties' dispute "revolves." However, in light of Plaintiff's representations that it started dealing with Lone Star in early 2007, the Court assumes that these other transactions are orders that were placed with Lone Star some time in 2007. This assumption is supported by the findings of the magistrate judge in North Carolina in a case related to this one, describing the April 2007 Order at issue here and four other "Lone Star Invoices" generated in 2007. (Pl. Mot. Ex. A at 7.) Apparently, the parties in this case are disputing the payment of these five invoices in another litigation, which seems to explain Plaintiff's vague reference to five transactions in its brief. (Pl. Mot. Ex. A.)

arguments, Defendant "pull[ed] from the combined histories" of Plaintiff's relationship with Lone Star and IKEX, rather than focusing only on the specific transactions in dispute. After an extensive review of the facts, the court found that "for all intents and purposes, [Plaintiff's] relationship with IKEX ended in or around April 2007, or at least changed in a material way." (*Id.* at 14-15, 17). The court went on specifically to note about the April 2007 Order that "[Defendant] acquiesces that the [April 2007 Order] was originally placed in Texas and sent to IKEX in North Carolina only upon the instruction of Lone Star's local representatives." (*Id.* at 21.)

While fully appreciating that the standard for assertion of personal jurisdiction is vastly different from the most significant relationship test being applied here, this Court nonetheless also recognizes that the factual findings of the North Carolina court support its holding in this case.[8] As with that case, Defendant here is attempting to use the cumulative history of the relationship between Plaintiff and IKEX to argue that North Carolina law should apply to the one particular transaction that occurred in April of 2007, ignoring the fact that the geography of the relationship between Plaintiff and Defendant had changed by then. As did the court in North Carolina, we find Defendant's argument unavailing

Finally, the Court notes that Texas has a much stronger interest in the resolution of the parties' claims than does North Carolina. The Plaintiff in this case is a Texas-based entity that distributes the product in question primarily to Texas-based end users. Texas has declared a strong interest in protecting its consumers. *See Mitchell v. Lone Star Ammunition, Inc.*, 913 F.2d 242, 250 (5th Cir. 1990) (noting that the Texas legislature

---

[8] The Recommendation of the magistrate judge was adopted by the District Court of the Middle District of North Carolina on Dec. 15, 2008. (Pl. Mot. Ex. A.)

and courts have developed an almost "paternalistic interest" in the protection of consumers and regulation of companies with business operations in the state) (citing *Dow Chemical Co. v. Alfaro*, 786 S.W.2d 674 (Tex. 1990)). Therefore, this Court holds that the law applicable to this dispute is that of Texas. We accordingly grant Plaintiff's Motion as to this issue, and deny that of Defendant.

## IV.   PLAINTIFF'S BREACH OF CONTRACT CLAIM

Defendant also contends that it should be granted summary judgment as to Plaintiff's breach of contract claim because this claim is without merit. Defendant argues that Texas law distinguishes between breach of contract and breach of warranty claims, and that Plaintiff's allegations clearly state a claim for breach of warranty but not for breach of contract.

In *Southwestern Bell Telephone Co. v. FDP Corp.*, 811 S.W.2d 572 (Tex. 1991), the Texas Supreme Court articulated a distinction between claims for breach of contract and those for breach of warranty.[9] In that case, the plaintiff brought an action against a telephone company when its yellow pages advertisement was not published as agreed. In its opinion, the court reasoned that the remedies for breach of contract are set forth in the Texas Business and Commerce Code (the "Code") Section 2.711,[10] and are available when the seller "fails to make a delivery." *Id.* at 576. Remedies for breach of warranty,

---

[9] The Court notes that *Southwestern Bell* dealt with a contract for services, rather than one for goods. However, because that court explicitly discussed the UCC as instructive even in the context of service contracts, Texas courts have treated its holding as binding in cases of contracts for the sale of goods. This Court will do the same.

[10] Section 2.711 of the Code provides in relevant part: "Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (Section 2.612), the buyer may cancel . . . ."

10

on the other hand, are found in Section 2.714 of the Code,[11] and are available when the buyer has accepted the goods but "discovers that the goods are defective in some manner." *Id.* The court then went on, however, to reject the defendant's argument that the telephone company's failure to publish the ad as agreed was "exclusively a breach of contract." *Id.* Instead, the Court found that the plaintiff was entitled to a remedy under both breach of warranty *and* breach of contract. *Id.* Accordingly, *Southwestern Bell* does not render the separation between these two remedies as clear as Defendant would have us believe.

Nonetheless, Defendant is correct that many Texas courts have read *Southwestern Bell* as standing for the proposition that a breach of contract claim may be asserted only when the seller fails to deliver the goods at all, whereas a breach of warranty claim exists when the seller delivers and buyer accepts but later discovers that the goods are defective or non-conforming.[12] *See Chilton Ins. Co. v. Pate v. Pate Enterprises, Inc.*, 930 S.W.2d 877, 890 (Tex. App.—San Antonio 1999, pet. denied) (opining that under the UCC, breach of contract damages are available for failure to perform, but not for delivery of non-conforming goods); *Ellis v. Precision Engine Rebuilders, Inc.*, 68 S.W.3d 894, 896-97 (Tex. App.—Houston 2002, no pet.) (noting that when a party fails to deliver the goods as promised a breach of contract occurs, but also ruling that the exclusive remedy for defective goods after acceptance is breach of warranty). The Fifth Circuit has similarly noted that, when a seller completely fails to deliver, the UCC provides for a

---

[11] Section 2.714(a) of the Code provides in relevant part: "Where the buyer has accepted goods and given notification (Subsection (c) of Section 2.607) he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable."

remedy under breach of contract, but not under breach of warranty. *Brooks, Tarlton, Gilbert, Douglas & Kressler v. U.S. Fire Ins. Co.*, 832 F.2d 1358, 1375 (5th Cir. 1987). Recently, however, the distinction between these two remedies has been blurred, by Texas courts as well as those in other jurisdictions interpreting the UCC provisions incorporated into their codes. *See, e.g.*, *Morgan Buildings and Spas, Inc. v. Human Society of Southeast Texas*, 249 S.W.3d 480, 491 (Tex. App—Beumont 2008, no pet.) (noting that the "non-conformity" referred to in Section 2.714 "'includes not only breaches of warranties but also any failure of the seller to perform according to his obligations under the contract'" and accordingly holding that the buyer could recover under breach of contract for non-conforming goods) (quoting comment 2 of TEX. BUS. & COM. CODE ANN. § 2.714); *Jetpac Group, Ltd. v. Bostek, Inc.*, 942 F. Supp. 716, 720 (D. Mass. 1996) (holding that key to the difference between breach of contract and breach of warranty is whether the non-conformity arises under general ideas of warranty, or under the specific obligations under the agreement).

As this case is plainly one involving defective or non-conforming goods, and not one of failure to deliver, this Court must determine whether a breach of contract remedy is wholly foreclosed. We hold that it is not. In drawing a distinction between breach of contract and breach of warranty, the case law makes relatively clear that when a seller wholly fails to deliver the goods promised, the buyer's remedy is found under a theory of breach of contract, not breach of warranty. *Brooks*, 832 F.2d at 1375. However, the case law is murkier, and somewhat contradictory, as to how the two remedies divide in cases of non-conformity. *Compare Ellis*, 68 S.W.3d at 896-97 (explanation above), *with Morgan Buildings*, 249 S.W.3d at 491 (explanation above). Fortunately, the provisions of

the Code are notably clearer on this point. The text of Section 2.714 strongly suggests that non-conformity may constitute a breach of warranty *and* a breach of contract, and Section 2.711 states that, in the event of a breach, a buyer may "justifiably revoke acceptance," thereby implying that breach of contract remedies may exist even after acceptance of goods. Indeed, even Defendant suggests in its brief that, where the non-conformity alleged may be fairly described as the buyer failing to "receive the goods it ordered," a breach of contract claim could exist. (Def. Br., Doc. No. 36, at 9.) The Court, therefore, holds that, where the non-conformity alleged relates to the specific obligations of the seller under the terms of the contractual agreement, the buyer's remedies fall primarily under a breach of contract claim. If, however, the non-conformity arises solely from the seller's express or implied warranties outside of its contractual obligations, or from generally defective goods, the buyer's sole remedy is for breach of warranty. This distinction, in the opinion of the Court, is consistent with Texas statutory law and reconciles the various case holdings distinguishing between these two remedies.

Turning then to the facts of this case, the Court concludes that a fact issue remains as to whether the non-conformity claimed here is one of general defectiveness, or one that arises from the specific terms of the agreement between Plaintiff and Defendant. Plaintiff alleges that it relied on the December 2006 order as a sample of the Material, and on the paperwork associated with that transaction in its expectations as to the terms of April 2007 Order. (Pl. Compl. ¶ 4; Brecher Decl. ¶ 7.) Plaintiff also avers that Defendant admitted that the Material delivered in fulfillment of the April 2007 Order was different from that which Plaintiff ordered and received in December of 2006. (Brecher Decl. ¶ 7.) However, the Court is given no other information as to the terms associated

with the December 2006 transaction or included on the purchase order submitted for the April 2007 Order. The record reflects nothing about whether there was any explicit agreement or expectation between the parties as to the durability of the Material. Furthermore, Plaintiff provides no information as to how the fabric in the Material sent in April 2007 differed from that sent in December 2006, or whether this difference rendered the April 2007 Material an entirely different product. Without these facts, the question of whether Plaintiff's allegations of non-conformity sound in breach of warranty or breach of contract remains unanswered. Therefore, the Court cannot find or hold that summary judgment is appropriate at this stage. Defendant's Motion is therefore denied.

## V.     CONSEQUENTIAL DAMAGES

Defendant also moves for summary judgment on the issue of whether Plaintiff's claims for consequential damages are barred. Defendant argues that the terms limiting Defendant's liability, reproduced in section I. above, became part of the agreement between Defendant and Plaintiff and thus rendered any claim for consequential damages invalid. Plaintiff argues that these terms were not part of the contract, because the invoice purported to alter a contract already formed upon delivery of the ordered goods and was therefore invalid under Section 2.207 of the Code.

### A.     Applicability of Section 2.207(a)

Section 2.207(a) of the Code, adopted from the UCC, states: "A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms." This provision is thought to

deal with two situations: (1) when a written memorandum confirms an agreement reached orally or informally, and (2) where an offer is made and written acceptance is returned that contains additional terms to the contract. *Preston Farm & Ranch Supply, Inc. v. Zyme Enterprises*, 625 S.W.2d 295, 299 (Tex. 1982). Defendant maintains that this case is the second situation, wherein the invoice sent on April 12 constitutes an acceptance with additional terms to the contract. Plaintiff's argument, however, is that Section 2.207 does not govern because the invoice served as neither an acceptance nor a written confirmation.

The Fifth Circuit case on which Defendant relies is *Permian Petroleum Co. v. Pretroleos Mexicanos*, 934 F.2d 635 (5th Cir. 1991). The court there decided the question of whether the plaintiff, the seller in that case, was entitled to contract interest by determining whether a provision for interest included in the order invoices became part of the parties' contract. The court concluded that this provision was part of the contract as either part of the offer or part of the acceptance under Section 2.207, noting that the seller "delivered the [goods] with invoices that were stamped by [defendant] upon receipt," and that defendant "never objected to invoice interest provision." *Id.* at 654. Plaintiff, on the other hand, relies on a Southern District case that it argues is more factually on point. In *Enpro Systems, Ltd. v. Namasco Corp.*, 382 F. Supp. 2d 874 (S.D. Tex. 2005), the plaintiff ordered steel plate from the defendant, who delivered the goods in a timely manner. The defendant in that case also sent a delivery ticket with the order that disclaimed all warranties and, following the delivery, an invoice confirming the terms of the delivery ticket. The court there found that the terms contained in the delivery ticket and invoice did not become part of the contract because "contract formation occurred

when [the defendant] accepted the offer by shipping the steel plate . . . before [the plaintiff] had any opportunity to review the ticket/invoice terms." *Id.* 880.[13] Indeed, the court there stressed that "probably as early as the moment the steel left [defendant] for shipment to [plaintiff], and certainly by the time it arrived at [plaintiff's] receiving department . . . each party had an enforceable contract against the other." *Id.* The *Enpro* court concluded that neither the additional terms printed on the delivery ticket nor those on the invoice were eligible for contractual inclusion under Section 2.207 of the Code. *Id.* at 884.

This Court finds *Enpro* to be the applicable and persuasive authority in this case. As in *Enpro*, Plaintiff here submitted a purchased order in April that functioned as an offer, which Defendant accepted upon delivery of the goods. Thus, the contract between the parties formed before the invoice with the additional terms was even generated. The invoice, therefore, could not have constituted an acceptance, because the enforceable contract had already come into existence when Plaintiff received it. In contrast, *Permian Petroleum* is factually distinct from both *Enpro* and this case. There, the court explicitly noted that the goods were delivered *with* the invoices, and that these invoices were stamped upon receipt. Unlike in this case, therefore, the *Permian Petroleum* decision explicitly addresses the situation wherein the additional contractual terms accompany the goods in response to the order/offer, and therefore form *part of* the acceptance. That case is therefore inapposite.

---

[13] Although the factual background of *Enpro* states that the delivery ticket "accompanied" the steel plates, the court there found that acceptance of the shipment occurred before receipt of the delivery ticket and invoice. *Id.* at 879-80. This factual ambiguity does not come into play in this case, as the invoice here unambiguously followed delivery of the Material.

The holding in *Enpro* finds additional support in Texas case law addressing the question of what can constitute a valid "written confirmation" under Section 2.207. In *Preston Farm*, for example, the Texas Supreme Court noted that "[c]ourts and scholars have questioned whether [Section 2.207] can apply at all to a sale in which the goods have already been shipped and accepted and a memorandum such as an invoice or statement altering the terms is sent contemporaneously with or subsequent to the shipment of the goods." *Preston Farm*, 625 S.W.2d at 299. There, the court found that a monthly statement sent after the goods had been shipped did not constitute an acceptance or written confirmation under Texas law. *Id.* at 300; *see also Tubelite v. Risica & Sons, Inc.*, 819 S.W.2d 801, 804 (Tex. 1991) (noting that the offer and acceptance occurred before the forms containing the additional terms were sent and holding that statements of account sent after delivery of the goods were not confirmations within the meaning of Section 2.207).

Furthermore, the Fifth Circuit has found that the written confirmation provided for in Section 2.207 is recognized "primarily as a writing necessary to satisfy the statute of frauds when the agreement reached is at least partially unenforceable . . . ." *Mid-South Packer, Inc. v. Shoney's, Inc.*, 761 F.2d 1117, 1122 (5th Cir. 1985). In *Mid-South*, the court, in interpreting a provision in the Mississippi code identical to Section 2.207 of the Texas Code, found that terms on an invoice sent a day after the shipment of goods did become part of the parties' agreement. *Id.* In so holding, the court expressly found that the invoice served as a written confirmation because it rendered enforceable a contract previously unenforceable under the statute of frauds. *Id.* at 1123. In other words, the court found that case to be like the first situation cited above in which Section 2.207 is thought

17

to apply. *Preston Farm*, 625 S.W.2d at 299. That court also relied on the fact that the extensive course of dealing between the parties clearly indicated to the buyer that invoices containing the terms at issue would be sent pursuant to its orders, thereby rendering the terms unsurprising. *Mid-South*, 761 F.2d at 1123. No party alleges, and it does not appear to the Court, that there is a statute of frauds issue in this case. While the Court knows little about the format of the purchase order submitted by Plaintiff in April, Defendant's performance of the contract through shipment of Material on the day after it was ordered, and Plaintiff's acceptance of the goods, definitively satisfies the statute of frauds. TEX. BUS. & COM. CODE. § 2.201(c)(3). Moreover, unlike in *Mid-South*, the parties here did not have an extensive course of dealing by which Plaintiff had come to expect an invoice purporting to add terms to the agreement, as discussed further below. As such, the Court holds that the invoice sent by Defendant on April 12 constitutes neither an acceptance nor a written confirmation within the scope of Section 2.207.

### B.     Course of Dealing

Although we find that the additional terms contained in the invoice sent on April 12 did not constitute an acceptance or a written confirmation, the Court must nonetheless determine whether these terms became part of the contract through the course of dealing of the parties. Texas defines course of dealing as "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." TEX. BUS. & COM. CODE § 1.303.

The Court is unpersuaded that the parties' course of dealing gave rise to an implied agreement regarding Defendant's disclaimer of consequential damages.

Defendant points to only one instance prior to the April 2007 Order in which an invoice with the additional terms was sent to Plaintiff. That transaction took place in February, and was for a product other than the Material. Defendant admits that, before this, none of the invoices sent by IKEX contained these preprinted terms. (Def. Mot. at 3). Plaintiff's silence, without more, as to additional terms printed on the back of a single invoice prior to the April 2007 Order, when these terms did not seek payment or any other affirmative action on the part of Plaintiff, is insufficient to demonstrate a "common basis of understanding." *Compare Preston Farm*, 625 S.W.2d at 298 (holding that a buyer's continued purchases and payment of service charges conspicuously shown on monthly statements gave rise to an implied agreement to pay the charge); *Tubelite*, 819 S.W.2d at 805 (holding that acquiescence to an implied contract by the party to be charged may be inferred from his affirmative actions, but not from a mere failure to object).

The Court therefore concludes that the invoice terms disclaiming consequential damages did not become part of the agreement between the parties through their course of conduct. As such, the Court grants Plaintiff's Motion for judgment as to this issue, and denies that of Defendant.[14]

## VI. DECEPTIVE TRADE PRACTICES CLAIM

Defendant moves for summary judgment as to Plaintiff's claim under the Texas Deceptive Trade Practices Act on the grounds that this is a Texas statute and North Carolina law applies to this case. However, because this Court has held that Texas law

---

[14] Because the Court holds that the additional invoice terms were not part of the agreement between Plaintiff and Defendant, the Court need not address the legal question of whether the terms materially altered the agreement nor consider the evidence presented by either party in support of its position on this issue.

applies to the transaction at issue in this case, Defendant's Motion is denied as to this point.

## VII. CONCLUSION

For the forgoing reasons, Defendant's Motion for Partial Summary Judgment (Doc. No. 17) is **DENIED**. Plaintiff's Cross-Motion for Partial Summary Judgment (Doc. No. 26) is **GRANTED**. Defendant's Motion to Strike (Doc. No. 47) is **DENIED**.

**IT IS SO ORDERED.**

SIGNED this 29th day of December, 2009.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE